Good morning, and may it please the court. Is it all right if I touch this microphone? Put it down that way. Because I'm very short. My name is Candace Carlion. I represent Robert Hillsman, who is the appellate and the plaintiff. I would like to attempt to reserve two minutes for rebuttal, if I may. Where the debtor obtains a loan extension through fraudulent concealment, and during the time of that fraudulent concealment, the debtor obtains and dissipates funds in excess of the amount due, the requisite proximate cause element of Sirianni has been satisfied, and the bankruptcy court erred in finding to the contrary. Section 523A2A provides that a bankruptcy discharge does not discharge an individual from a debt obtained by the extension or renewal of credit to the extent it is obtained by false pretenses, a false representation, or actual fraud. Let me stop you. Yes, Your Honor. I'm sorry to ask these kind of questions. I guess I'm touched by this issue. I try to find out why this case is in front of us and see if we really have the case in front of us. So this argument that you're making in this case was made the first time to the bankruptcy court. It went up to the BAP, and the BAP returned this case back to the bankruptcy court, suggesting that you had to show, if you will, this connection, causal connection, but they also said that they ruled in your favor that there were more than just one time when this problem or this fraud could have occurred, and therefore the bankruptcy court had to look at two issues and not one. Then, when it goes back to the bankruptcy court on remand, you never make this argument to the bankruptcy court. When you go to the BAP, you don't make this argument to the BAP. I agree that you made it to the bankruptcy court of the BAP on the first appeal, and I agree that the BAP reversed and came out on your favor because they gave you another reason to look at the same argument based on another thing that you might have done, but I guess I'm trying to figure out why didn't you make this argument to the bankruptcy court when it was remanded? Your Honor, the argument that the— Your argument about causal connection was never raised to the bankruptcy court on the remand and never raised to the BAP, and I'm trying to figure out why, then, is it in front of me? All right, and I apologize, Your Honor, for not quite understanding what argument you're referring to. The causal connection. Right. The proximate cause that there were valuable— The argument we're talking about today. That there were valuable collection remedies which were dissipated during the time of the misrepresentation. Well, that you had to prove a causal connection between what you suggest is your loss and whether it was really a loss. That's right. That's what the whole appeal is about, and certainly— I agree. Why didn't you make that argument in front of the bankruptcy court on the remand? Well, with all due respect, I did, Your Honor. The brief that I filed before the bankruptcy court on remand explained how there were assets that had value that— Well, to be fair, it seems to me that you jumped to the idea or to the conclusion that somehow your, if you will, your argument is absolutely clear, but the basic argument you're making is that I don't need any causal connection between my note and the damage. All I've got to do is say, it's this amount for the note, it's this amount for the attorney's fees, it's this amount for that, and you've got to give it to me. Okay. And then you suggest that that's enough, but the bankruptcy court, the BAP, had already told you that wasn't enough. What you needed to do is you needed to tell how much the loss was. It wasn't enough to say just the note is this and the fees are that. You've got to come up with a loss amount, which is the causal connection, and you never did that. Thank you. Thank you for giving me the opportunity to explain, Your Honor. And I appreciate that that note was made in the second decision that Judge Nakagawa issued. But in fact, the causal connection exists with regard to amounts which exceed the amount of the note. The first settlement resulted in Mr. Escoto receiving $118,000. That occurred after the fraudulent concealment. The second settlement resulted in him receiving over $142,000. That happened after the fraudulent concealment. And in addition, there was another $370,000 which he removed from a joint bank account after the fraudulent concealment. And those issues were very clearly argued to the bankruptcy court. But it isn't a matter of adding up all the amounts that you think they owe you. It's a matter of after you get the total amount you think they owe you, did you really lose all that amount? Or is there in some amount you might collect? And that's what the BAP was telling you the first time when you went on appeal. But they came out in your favor because they said you could look at another time when they might have fraudulently taken you. And so send it back and do it again. But when you went down to the bankruptcy court again, you still didn't try to tell us what the loss was. You still didn't address the loss. And when you went up to the BAP again, you just forgot it. You didn't talk about that. You just consistently hammer on the fact it's everything that I could have lost, period, plus fees, plus interest, and that's it. And they just keep telling you, come on, there's no causal connection to that. All right. So the extension of the $200,000 loan was obtained by fraud. He obtained an extension of that loan in that amount by fraud. And then the question is, can I establish the Sirianni proximate cause that during the time of that fraudulently induced extension, did I lose valuable collection remedies? And if so, in what amount? And, Your Honor, that depends on whether you had any security interest in those sums, and that depends on whether the note, in effect, pledged. So there are two branches. Right. One is, did I have a pledge of those accounts? And what's your position on that? That I did. And what's that based on? Based upon the stipulation of the parties, the testimony of the parties. What's the stipulation of the parties got to do with it? When the parties. . . Do you either have a security interest that you can enforce or you don't? You don't have it just because somebody comes in afterwards and tries to say you do. Well, the Bankruptcy Court found that the note was uncertain, that there was an ambiguity. And. . . You presume it's ambiguous, but the Bankruptcy Court doesn't say it's ambiguous. Nobody says it's ambiguous. Everybody says it's not ambiguous. You presume an ambiguity. You never tell me why, but you presume it's ambiguous. But the Bankruptcy Court and neither BAP say it's ambiguous. It says you have no security interest in settlement proceeds at all. And even if there was an interest, it's unperfected. All right. So I disagree, and I believe that the Bankruptcy Court actually said in the second decision that the note was ambiguous. But, Your Honor, moving forward to answer the question, in addition to the stipulation of the parties, the testimony of Dr. Escoto and the testimony of Dr. Hilsman all established that there was a pledge of the president. The proposition that the proper interpretation of the note under Nevada law includes not only the whole context of the textual nature of the note, but also the subsequent conduct of the parties? Yes, Your Honor. And I have cited to you a case for that proposition, that under Nevada law, when the parties' statements as to their intention made at trial are appropriately used to determine the meaning of that contract, because all of the rules of construction that the Bankruptcy Court tried to apply are intended to get at one thing. What did we need? It's your position that the Bankruptcy Court, pardon me, and the BAP incorrectly applied Nevada law because they did not take into consideration the subsequent conduct of the parties in interpreting whether the note indeed gave a pledge interest or not? It is certainly not. To answer Judge Smith's question, if there was a pledge interest that should have been found by the proper application of Nevada law, was it error not to do so if there was no evidence of the pledge being effectuated? So there was certainly no perfection. And the question is? How do you perfect a security interest in a settlement proceed that the debtor is getting? How do you do that? One of two ways. Under Nevada law, either by filing UCC1 that identifies the tort claim or by sending a notice to the other party that you have an assignment of that account. Did you do either? No. All right. Certainly the security interest is unperfected. And do we have anything in this record which would suggest then if you have an assignment to do that you have any priority to this money? There is no evidence that we would have priority to this money. So therefore, there is no reason to give it to you because it's not in the record. The record establishes that we had remedies, which if we had not been defrauded, we could have exercised. And those remedies include attaching the proceeds of the lawsuit, which were in excess of the amount owed to Dr. Hilsman. So what you're saying to us is had we known about it, we could have gone to court and filed a lawsuit to get a judgment so that we could have attached? Is that what you're saying? Well, two things. We could have filed an independent lawsuit and obtained a prejudgment writ of on any claim of contract. But go forward. What else? If you are undersecured or unsecured. So that remedy was available. Or two, we could have intervened in the action, in the Christopher Holmes action, and said we have a right to those proceeds. Don't release them to Dr. Escoto. And we would have had that right. And we were unable to exercise those rights, including seeking a constructive trust as to those proceeds, because Dr. Escoto fraudulently concealed the settlements. And in both cases, he settled the action before the funds were distributed. So there was a gap in time during which my client had valuable State court remedies to obtain those proceeds. And my client was prevented from doing so simply because of the fraud of the debtor. And, Your Honor, it's my contention that that meets the proximate cause requirement of Suriani if it exists. Under this Court's decision in ---- Just because you have remedies, I'm trying to figure out still how that meets the proximate cause. I can understand that you can argue because of your remedies that you have a total value of a loan, interest, default interest, late charges, attorney's fees. That may be the value of your remedy, but that doesn't suggest how much the value has decreased. That doesn't suggest what value should be accepted from the discharge, because the only value accepted from the discharge is the difference between what you have and what you could have had and what you have. But we don't know what that is, because it's not in the record. But we do, Your Honor, because we know that the concealment lasted through the date of the bankruptcy, and on the date of the bankruptcy, there was nothing. So, Your Honor, we know ---- What do you mean, nothing? There was nothing. There were no non-exempt assets. He had spent all of the money. It was all gone, the $118,000, the $142,000, and the $370,000. Didn't the expiration of the extension occur well before the bankruptcy? Ten months before the bankruptcy, Your Honor. Why didn't you use that as the end point, the loss between when you could have, assuming you had some secured interest and you could have intervened in the lawsuit, why wouldn't it be from that point in time when you could have exercised your remedy to when you should have, which would have been the expiration of the extension? Because during that time, the concealment, the fraud continued, because both parties testified to you, all three parties testified that the loan was going to be repaid with the settlement, and defendant continued to assert to my client the case had not yet been settled. And during that, so that concealment ---- Was there a further extension after the one that ended ten months before the bankruptcy? There was not a further extension, but there was ---- And why wouldn't that be the right point in time? Because my client was defrauded into believing that that asset still existed. The schedules and statements would have also shown if within the year prior to the bankruptcy there had been a transfer to an insider affiliate or if there had been a transfer without effective reasonable consideration, and they didn't. So the record has enough to show that that dissipation occurred more than 12 months before. The first bankruptcy decision that said, as of March of 2011, when the formal extension was entered into, your remedies were worthless, tells me that my remedies, which had value in 2008 at the settlement, in 2009 at the settlement, and in 2009 when the funds were withdrawn from the bank account, that was dissipated by the time that extension wore off, because they were already gone in 2011 when we signed the written extension. But the prevailing fraud in this case, Your Honor, I suggest gives you sufficient grounds to deny a discharge under the facts of this case. And I'll reserve my remaining time if I may. Thank you very much, Your Honor. We've taken you past your time, but we'll give you two minutes in rebuttal. Thank you, Your Honor. Good morning. Thank you, Your Honor, for your time. I'm Sam Schwartz on behalf of Marcus Cotto. I think the Court has highlighted the key issue in this case, and it's a lack of evidence. It's a failure of Dr. Hilsman to demonstrate the loss of his collection remedies to the extent he had any at any point in time in the case. And I think, Judge Smith, you highlighted that in connection with the remand that goes back to bankruptcy court where Dr. Hilsman comes right back asking for the $347,000 that he had asked for in the first trial. And I think you highlighted the relevant points from the first BAP appeal and the remand, and that the BAP outlined what needed to be done, but didn't say that the record needed to be reopened. And the BAP said just that Judge Nakagawa needed to revisit what had occurred and what was shown to him at trial. And I think where Ms. Carlion is not exactly giving a clear view of what occurred at the record during the hearing is that these statements of value and evidence that she's talking about, Judge Nakagawa said, were never proven. There was evidence in connection with the first settlement, for example, that all that money went back into the litigation. And so none of that money came out. And as we put in our reply brief, our opposition, that $118 came out, went back into the litigation, and turned into $142. So there was that discussion about where those monies went. I think, Judge Smith, you hit the nail on the head when we talk about . . . Actually, I apologize, Your Honor. I think it was you that was talking about what are the dates we look at. And if we look at from March of 2011 to March of 2012, which is the timeframe of the extension, that's where we look at what were the valuable remedies that were available at that point in time and how much did they decrease. There was no evidence of any decrease in value. In fact, the testimony that was elicited during the bankruptcy was that Dr. Escoda's income was actually going up over that period of time, that he was making more money, that he was more readily collectible, had Dr. Hilsman elected in 2012 when his note matured, to pursue his remedies and to pursue collection. Is there any relevance to the point that counsel made that the concealment continued through the time when the expiration of the extension occurred? I don't believe there's any evidence of that either in the record, Your Honor, that the concealment continued in 2012. It's simply that the note matured and payments were not made. There were discussions and the two witnesses had a different view of what occurred in that period of time.  Would that change the analysis as to the appropriate end time? I don't believe it would because you still had a matured note and you had no further extensions. You didn't have another extension obtained by fraud or some sort of misrepresentation. Without that, I think that's your stop date. Even if you did go forward, the evidence that was adduced at trial is that Dr. Escoda was still making in excess of $200,000 during that period of time pre-bankruptcy so that he was more collectible, arguably, in the 10 months after the note matured up to his bankruptcy point in time. It seems to me that the reason the BAP sent this back for the first time was that the bankruptcy court had focused on the reaffirmation of the commitment to pay the debt in August of 2012. The BAP said there's not only that but also the one-year extension agreement would be a separate fraudulent action, if you will, and asked that the bankruptcy court consider them both. Okay, so if we talk about the one-year extension, there is a second alleged fraud, which I understand nobody disputes, that Escoda reaffirmed his commitment to pay the debt in August 2012. Dr. Escoda was still making intermittent payments from, I think it's really March of 2012 forward. Dr. Escoda was never current on his payments to Dr. Hilsman. But he did reaffirm in August of 2012 that he would pay the debt, right? I think he was still trying to pay it. That's correct. Reaffirm, I think, is a technical word in the bankruptcy context. I know it's technical. That's why I used it. Yeah, I don't believe he ever reaffirmed the debt in terms of saying it. So you think I have that wrong? I don't think he legally reaffirmed the debt and said, I will continue. He was still legally obligated to pay it. He had a matured debt. There wasn't an extension, if you will, Your Honor, or a reaffirmation as I would think of it in the bankruptcy context that typically would happen post-filing, I would say. With that said, though, certainly Dr. Escoda was still making intermittent payments after the note matured in 2012. Okay. So I think what the BAP had said to Judge Nakagawa when they remanded was you need to go back and look at 2008, 2009, which were the first two settlements. You need to give us some feedback in terms of what did the pledge mean. And Judge Nakagawa, which the BAP, I think, agreed with the second time on appeal, found that, one, there wasn't a pledge of the settlement proceeds of the litigation. There was a pledge of Dr. Escoda's dental practice. He owned a dental building, also the property in his dental building. There was testimony that Dr. Hilsman had a second in connection with those assets. It's not in the record, but that building was foreclosed. So it was— How could the judge have found there was no pledge of the settlement proceeds when that was stipulated and there's testimony by both parties that there was such a pledge? I think the difference—well, okay, so the judge disagreed with our legal impact of what the pledge meant. So Judge Nakagawa found that the note didn't affect what we agreed, what we thought it meant. So, one, two, I think that doesn't change the nature of this. But Judge Nakagawa didn't consider what the subsequent conduct of the parties was as an interpretive tool to define what the note pledge agreement was. I understand that analysis, Your Honor. I think really what Judge Nakagawa found was that Dr. Hilsman was still unsecured regardless of how you looked at what the effect of the stipulation was pre-bankruptcy. And so when you start to look at his valuable collection remedies, or if there was any value to his collection remedies, the pledge that was in the stipulation didn't change the legal nature of the— the unsecured nature, I should say, of Dr. Hilsman's debt in the case. It didn't—just because the parties agreed there was a promise to pay after the case settled— it was an agreement that the settlement proceeds had been pledged to pay the note. Understood, Your Honor. I think what Judge Nakagawa said in his reading of the note, that he didn't agree that was the legal effect of that pledge. But because he didn't consider the subsequent conduct of the parties as interpretive of their agreement. I think he did, Your Honor, in connection with the stipulation. I think he did look at that because it was argued. Is there any indication that he said I'm determining the substance of this note based on its text and not upon any other subjects or factors? I don't believe he uses that word—those words, Your Honor. But he does quote the note extensively in his opinion in the second time around when he goes through the language on page 8 and talks about what it says. It's exceedingly odd to me that both parties testify that they intended to pledge— to make a pledge, and they stipulate to it, and the judge finds, well, that's all right, but I'm going to find differently. Well, I think the net effect gets you to the same place, Your Honor, even if Judge Nakagawa says, okay, I understand the pledge and why I think it gets you to the same place. It's still an unsecured promise. That may be—it may be an unperfected pledge. Certainly. And that's been conceded. Correct, Your Honor, and I think that's exactly where we end up, and I think that's really the crux of what Judge Nakagawa says, is that it's an unsecured claim. And I think here what you have—for me, I sort of break this up into categories. You have 523A2A and 523A2B. So you have—then I think the cases start to break all that down between do you have some sort of fraud and a misrepresentation or a writing which gets you into A2B in connection with original debt versus the cases that talk about agreements to forebear or forextensions and talk about misrepresentations that are 523A2A. And here I want to at least touch on some of the arguments about is there a basis for this court to reconsider Sirianni perhaps or look at some of the other sister courts. And I want to make certain that we talk about that case law, and I think there is no basis in front of this court to reconsider Sirianni. I think when you look at 523A2A and all the cases that talk about forbearance or agreements to extend at some point in time based on statements, there has to be some showing of proximate cause and a loss of collection remedies that were valuable. And here back to the top of where I started, we do not have any evidence in the record of the value of the loss of those collection remedies. And absent that— What about the prejudgment attachment possibilities? Well, I think the prejudgment attachment possibilities, there's no evidence of the value of those still in terms of where they could have gone and what they were worth. Ms. Carlion has argued that it was worth in excess of $200,000 and almost $60,000, but the record talked about how the two different settlements, one went back in. So there's no evidence that the money that was involved in the first settlement didn't go back in to fund the litigation going forward for experts and other expenses and costs. Did they have a prior lien to any attachment that would apply? There were no liens. There was no effort to attach. There was no security interest in connection with any of the real property or personal property. So there was nothing done to make those possible remedies valuable. And I think that's another hurdle. The case law talks about we don't have to go down the rabbit hole and try to decide what could you have done, what was possible, but just look at the value of those potential remedies. And that's one of the issues that if we talk about what was the value. But Hilsman says that the reason I didn't file an action and seek a predetermined attachment was because I was defrauded. I understand that. But he certainly could have filed notice of his lien or interest in those settlement proceeds at any point in time, which would have been the prudent thing to do at the outset of the litigation would have been to say, I have an interest in the outcome here and tell all the parties. He never elected to do that. Well, is he required to do that in the context of fraud? I mean, does he have to take all of these steps or do we just look at what did he lose because of the fraud? No, I don't think he has to do those things, but it's one of the evidence, part of the lack of evidence that that potential remedy had any value. And I think therein lies the issue of what we're talking about, that there isn't evidence of what exactly the timing was of all these monies, where they went, and then the remedies that were available, what the value of them was at the time, much less what the value was from March of 2011 to March of 2012. And when we talk about that extension period, there's no evidence in there. If that's what Sirianni says we're supposed to look at, there's just no evidence there. And so Judge Nakagawa even said there was some discussion by Dr. Escoto's ex-wife that there was over $300,000 in a bank account that had been dissipated, but there's no evidence as of time. There's no subpoena of those bank records. None of those things were sought after in connection with producing what was available at what point in time and where were those assets. So with that, I know I have some time left. I would simply submit to the Court that given the lack of evidence at the bankruptcy level, there is no basis to overturn what the Bankruptcy Court found, and that given the record that's before you, both the Bankruptcy Court and the BAP, the second time around got it right, and I would ask that you affirm. Thank you. Ms. Carlyon. Carlyon, like a vehicle and an animal, Your Honors. I just wanted to make the point very briefly that under the Apte decision, this Court has held that the nondisclosure of a material fact in the face of a duty to disclose has been held to establish the requisite reliance and causation for actual fraud under the Bankruptcy Code. It's consistent with the nondisclosure cases that that burden is met. I wanted to address very briefly— Just a minute. You're talking about Apte? Yes, Your Honor. Apte really isn't this case, is it? I believe, Your Honor, that the holding of— What are the facts that are in Apte? It isn't like this case at all. That involved an infusion of new money into a party's relationship, and thus the causal connection was easily proven. That's exactly what the Apte Court said. They didn't say you didn't need a causal connection. Your Honor, I read you the provision, which I think is relevant, and I appreciate that you disagree. I did want to— Well, all I'm trying to do is get you to explain to me what you're saying because you read me a provision that I don't think has anything to do with the holding, so I'm letting you explain it. If you want to explain it, fine. If you don't, that's fine too. With the limited time, I wanted to address something else. I know you want to go elsewhere, but I guess you go. Thank you, Your Honor. If my question isn't important to you, go where you want to go. Your questions are all important to me, and I'm trying to answer as many of them as I can in a limited time period. I wanted to get back to your idea that the bankruptcy court did not find the contract to be ambiguous. The court made that finding, including on three— Supposing they did, even if they did, what did the BAP do? That's where you are in front of me. Well, Your Honor— What did the BAP do? The BAP affirmed— And said the contract was unambiguous. Yes, Your Honor, and you— And that's what I've got in front of me, is it not? You review the bankruptcy court, didn't nobody, Your Honor. I understand, but I understand also what the BAP did. So the words, I grant the right, I pledge all items of value, and I grant the right to garnish settlement monies without the need for court order, was testified to by both parties and stipulated to by the parties to be a grant of that settlement proceeds to collateralize the loan. And, Your Honor, I see that I am out of time. I very much appreciate the chance to argue before you today, unless I can answer any other questions. Thank you very much. Thank you, Your Honors. And thank both counsel for their argument. And with that, we will stand recessed until tomorrow morning at 9 o'clock. Thank you. All rise.
judges: Bea, N.R. Smith, Staton